UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| JOHN "RALPH" ORTEGO | CIVIL ACTION NO. 10-510 |
| VERSUS | MAGISTRATE JUDGE HANNA |
| MERIAL, LLC | BY CONSENT OF THE PARTIES |

*MEMORANDUM RULING AND ORDER*

Before the court is Defendant Merial LLC's Motion for Summary Judgment. (Rec. Doc. 21). Also before the court is Defendant Merial LLC's Motion to Strike Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [26], Plaintiff's Statement of Undisputed Material Facts [26-1], and Accompanying Exhibits [26-2 through 26-5] on the basis they were not timely filed. (Rec. Doc. 27).

With regard to defendant's motion to strike, the plaintiff's opposition was due shortly after the Christmas and New Year's holidays. While the filing by the plaintiff was late by a few days, the tardiness was not due to bad faith conduct on the part of plaintiff or his counsel. There is no evidence offered or suggested that the defendant was prejudiced by the delay. On the contrary, the defendant was able to submit a reply brief in response to the opposition which was considered by the court. Therefore, the motion to strike is **DENIED** and the court will consider the motion for summary judgment as opposed.

For the following reasons, and the reasons given at oral argument, defendant's

1

motion for summary judgment (Rec. Doc. 21) is **GRANTED IN PART AND DENIED IN PART**.

*Background*

This matter was removed from a Louisiana state court asserting diversity jurisdiction under 28 U.S.C. §1332.  Citizenship and the amount in controversy were reviewed.  Plaintiff filed suit for damages caused by the illness and death of his dogs from heartworms.  Merial, LLC manufactures a heartworm preventative known as Heartgard and Heartgard Plus (hereinafter collectively referred to as Heartgard). Plaintiff bred Doberman Pinscher's and in his petition he alleges he purchased "Ortego's Red Terror,"[1] "Chica XXIII," "The Pedal of Ortegos Red Rose," and "Ortego's Cujo" to be bred. Plaintiff alleges that on or about May 15, 2009, his main stud dog, "Ortego's Red Terror" died and subsequently the remainder of his dogs became severely ill due to the failure of Heartgard  to prevent heartworms, despite plaintiff's administration of the drug as prescribed.

Plaintiff alleges defendant is liable for "negligently manufacturing and selling a drug which defendant knew or should have known did not perform as advertised," "marketing a dangerous defective drug," "breach of contract" and "breaching its contract with the public concerning the effect of the drug."[2]  Plaintiff asks for damages in the

---

[1]This dog is called both "Red Terror" and "Red Terra" in the submitted briefs and supporting documents.

[2]*Petition for Damages* (Rec. Doc. 1-1), ¶ 10, 12.

form of loss of income, past, present and future veterinary expenses, emotional damages, and exemplary and punitive damages. Although not specifically pled by plaintiff, Merial, in support of its jurisdictional allegations in the notice of removal, contends that implicit in the factual allegations contained in the state court pleadings is a claim in redhibition which, if adequately proven, would also give rise to an award of attorney's fees. La.Civ.Code Art. 2545.[3] At oral argument plaintiff apprised the court that one of his theories of liability was in redhibition pursuant to La.Civ.Code Art. 2520 *et. seq.*

In its motion for summary judgment, Merial argues plaintiff lacks the necessary proof to support his claim. Specifically, Merial argues the evidence in the form of records from the treating veterinarian, Dr. Coreil, as well as his deposition testimony shows two of the dogs, Chica XXIII and Red Rose (both deceased), were never antigen tested nor diagnosed with heartworm disease before or after they died; neither were tested for heartworms before starting Heartgard; neither received the proper follow up heartworm testing; and neither one of the dogs were consistently administered Heartgard in the correct dosages at the proper thirty-day intervals. Although it is undisputed Red Terror died of heartworm disease, and Cujo and Pedals both tested positive for heartworm infection at about the same time, Merial contends none of these dogs were tested for heartworms before starting Heartgard and they did not get Heartgard in the appropriate time intervals. Therefore, what caused the contraction of heartworm disease in these three

---

[3]*Notice of Removal* (Rec. Doc. 1), p. 5.

dogs is speculative as it could be due to pre-existing infection and/or owner non-compliance as opposed to lack of efficacy of the drug. Put more concisely, Merial contends the plaintiff cannot meet his burden of proof on an essential element of his claim; to-wit, that a failure of the product caused the death or illness of the dogs.

Merial also argues that the plaintiff cannot prove that a redhibitory defect existed in Heartgard that would render it useless for the purpose for which it was intended. Alternatively, if plaintiff has a claim in redhibition, it is prescribed.

Merial further argues that the plaintiff cannot prevail on a claim in negligence under La. Civ. Code Art. 2315. Finally, Merial contends plaintiff has no evidence to support a claim for exemplary damages nor does he even state a cause of action for exemplary damages.

In response, plaintiff argues he administered the medication as prescribed and in any case, whether he administered the medication properly is a disputed issue of material fact. He further argues that Merial has warranted the efficacy of its product as 100 percent, a representation on which he and/or his veterinarian has relied, but which is not true. Due to its lack of effectiveness, the dogs contracted heartworms and died or became ill. The plaintiff does not contest some aspects of Merial's motion and he has put forth no viable opposition to others. Plaintiff also concedes the death of two dogs, Red Rose and Chica XXIII, cannot be linked to the defendant's product.

*Applicable Law and Discussion*

***Summary Judgment Standard***

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Minter v. Great American Insurance Co. of New York, 423 F.3d 460, 465 (5th Cir. 2005).  A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party. Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008), citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact.  Washburn v. Harvey, 504 F.3d 505, 508 (5th Cir. 2007), citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of a material fact.  Id.  All facts and justifiable inferences are construed in the light most favorable to the nonmovant. Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir. 2008), citing Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986), Anderson v. Liberty Lobby, Inc. 477 U.S. at

255.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim. Norwegian Bulk Transport A/S v. International Marine Terminals Partnership, 520 F.3d 409, 412 (5th Cir. 2008), citing Celotex Corp. v. Catrett, 477 U.S. at 325.

In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and by affidavit, depositions, answers to interrogatories, and admissions on file designate "specific facts" showing there is a genuine issue for trial. Celotex Corp v. Catrett, 477 U.S. at 324, 106 S.Ct. At 2553. The motion should be granted if the non-moving party cannot produce evidence to support an essential element of its claim. Condrey v. Suntrust Bank of Ga., 431 F.3d 191, 197 (5th Cir. 2005). However, the initial step for the court in undertaking this analysis is to ascertain from the applicable substantive law which factual issues are material. Ladue v. Chevron, USA, Inc. 920 F.2d 272, 273 (5th Cir. 1991).

***Louisiana Products Liability Act***

At oral argument, plaintiff clarified that his claims were brought against Merial both under La.R.S. 9:2800.51 *et seq*., the Louisiana Products Liability Act (LPLA), and redhibition, La. Civ.Code Art. 2520 *et seq*. Except as noted below, the LPLA provides "the exclusive theories of liability for manufacturers for damage caused by their

products." La. R.S. 9:2800.52. Therefore, the plaintiff's negligence claims brought under La. Civ. Code Art. 2315 will be dismissed.

Under the LPLA, the manufacturer's responsibility to a party injured by its product is set forth in La. R.S. 9:2800.54(A), which provides:

> The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

La. R.S. 9:2800.54(B) provides in pertinent part that a product can be unreasonably dangerous when it is unreasonably dangerous in construction or composition, La. R.S. 9:2800.54 (B)(1), or if it does not conform to an express warranty, La. R.S. 9:2800.54(B)(4).

With regard to whether a product is unreasonably dangerous in construction or composition, La. R.S. 2800.55 provides:

> A product is unreasonably dangerous in construction or composition if, at the time the product left the manufacturer's control, the product deviated in a material way from the manufacturer's specification or performance standards for the product or from other wise identical products manufactured by the same manufacturer.

The elements of a claim for failure to conform to an express warranty are found at La. R.S. 9:2800:58 which provides:

> A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because

7

the express warranty was untrue.

Therefore, in order to survive summary judgment, plaintiff must put forth specific facts that demonstrate there is a genuine issue as to whether Heartgard was unreasonably dangerous in construction or composition and that his alleged damages were proximately caused by that characteristic.

The plaintiff can also prevail if he can, with specific facts, demonstrate a genuine issue that the product was unreasonably dangerous because it did not conform to an express warranty which induced him or another person to use the product, and that the alleged damage was proximately caused because the warranty was untrue.

Dr. Coreil testified that Merial's warranty as to the efficacy of Heartgard was that it "was very effective" and "in some places it was literally 100 percent effective."[4] He further testified that the effectiveness was originally "thought to be 100 percent."[5] This testimony supports the elements regarding the performance standards for Heartgard as well as the warranty contemplated under the LPLA. The defendant contests that this constitutes an express warranty.

Excerpts from the plaintiff's deposition (Rec. Doc. 26-3); the testimony of Dr. Coreil and the records of the dogs attached as exhibits (Rec. Doc. 26-4), were offered to support the argument that plaintiff purchased Heartgard that was designated by the

---

[4] Exhibit C to *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (Rec. Doc. 26-4), p. 140.

[5] *Id.* at 14.

8

veterinary clinic in the records under one dog's name, yet the purchase was in sufficient quantities that he was able dispense it to his other dogs. Which dogs got what dose is not reflected in the charts. Thus, the records of Dr. Coreil do not conclusively establish that one dog's chart reflected the medication purchases for only that dog.

The plaintiff testified that he "raised them all as babies" and he would start the dogs on Heartgard after the "10 in 1 shots whatever them shots are as babies."[6] According to plaintiff, he would be told when to start the dogs on Heartgard, and other than one dog, since 1977, all of his dogs were given Heartgard for heartworm prevention.[7]

Plaintiff also attached an Affidavit of Gwendolyn Doucet, his ex-wife, who stated that she assisted plaintiff in caring for the dogs, that he was "very aware of the dangers of heartworm disease and was meticulous in his preventive measures concerning the disease," and "to the best of her recollection, Heartgard medicine was administered to all of the dogs every thirty (30) days to each of the dogs." (Rec. Doc. 26-5).

The entire transcript and exhibits attached to Dr. Coreil's deposition were subsequently produced to the court without objection.[8] There are records from the

---

[6] Exhibit B to *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (Rec. Doc. 26-3), p. 51.

[7] *Id.*, pp. 49, 51.

[8] Fed. Rule Civ. P. 56(c)(3), effective December 1, 2010, provides the court "need consider only the cited materials, but may consider other materials in the record."

9

treatment of other Doberman Pinschers owned by the plaintiff which were not the subject of this lawsuit which also document larger quantities of Heartgard were purchased than would be needed for a single dog for a monthly treatment, further supporting plaintiff's contention that he supplied the dogs with the appropriate amount of medicine at the correct intervals by buying Heartgard in sufficient quantities to do so.[9]

It is undisputed that Red Terror, Cujo and Pedals were not tested for heartworms before starting Heartgard. Dr. Coreil testified there was no way for him to know when the dogs acquired infection, other than to say it was prior to the seven months before the heartworm disease was detected in June of 2009.[10] However, Dr. Coreil also testified he would find it "unusual" for three dogs to die from heartworm disease that were on heartworm prevention in one family in one kennel.[11] Further, he testified that he had "numerous" dogs who tested positive for heartworms that have records demonstrating the dogs never missed a dose.[12] Finally, he testified that "in recent past" many of his patients had been positive for heartworm disease that were on preventative medication.[13]

---

[9] See Coreil Deposition Records pertaining to Ash (CVC-0061), Chica's Black Widow (CVC-0063-0065), Cici (CVC-0072-0074), Gator (CVC-0078) and possibly Sasha (CVC-0105). These have been filed in the record.

[10] Exhibit C to *Merial LLC's Motion for Summary Judgment* (Rec. Doc. 21-3), pp. 99, 107.

[11] Exhibit C to *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (Rec. Doc. 26-3), p. 144.

[12] *Id*.

[13] *Id.*, p. 14.

Plaintiff produced evidence that the dogs were on Heartgard, in the appropriate doses, at the appropriate intervals, and began Heartgard per the direction of the veterinarian from the time they were puppies. It was discovered they had heartworm disease at about the same time, and therefore, the plaintiff argues it is a disputed issue of fact whether they contracted the disease due to a loss of efficacy of the drug or failure of the owner to comply.

The court finds that a justifiable inference can be drawn from the facts put forth by the plaintiff that the dogs died or became ill as a result of a loss of efficacy of the drug, and there is a material issue of fact whether the product was unreasonably dangerous in construction or composition because it did not meet performance standards, and that characteristic proximately caused the plaintiff's damages.

The court also finds there finds there are genuine issues of material fact as to whether there was such an express warranty that Heartgard was 100 percent effective. Dr. Coreil testified that the plaintiff was giving the medication to his dogs not to get heartworm disease and "he was under the impression that it was 100 percent effective."[14] Therefore, there is a genuine issue whether the plaintiff relied on the warranty, if it existed, and whether it was untrue.

Finally, as previously stated, there is a genuine issue whether the dogs contracted heartworm disease due to the loss of efficacy of the drug considering the plaintiff's

---

[14]Exhibit C to *Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment* (Rec. Doc. 26-3), p. 10.

11

factual evidence that all of the affected dogs who were documented to have heartworm disease at about the same time, were from the same kennel, were administered the medicine, in the appropriate dose, at the appropriate interval, from the time they were puppies at the direction of the veterinarian.

In addition, based on that put forward by Merial, whether the dogs initially contracted heartworms before beginning Heartgard or after beginning Heartgard may not even be determinative of plaintiff's claims. Plaintiff alleges Merial is responsible for "manufacturing and selling a drug which defendant knew or should have known did not perform as advertised" and "breaching its contract with the public concerning the effect of the drug."[15] That is, plaintiff has not limited his claims against Merial to Heartgard's failure to prevent the *initial contraction* of a heartworm – plaintiff's claims encompass Heartgard's failure to prevent *further* infective process and worsening of the heartworm condition, even if a dog had a heartworm or heartworms at the beginning of treatment with Heartgard. Merial's own expert stated as follows:

> Even with inadequate and inconsistent administration, ivermectin[16] helps to reduce the severity of non-juvenile heartworm disease while eliminating tissue larval stage infections acquired in the month preceding administration of the drug.[17]

The submitted evidence shows several years elapsed from the initiation of

---

[15]*Petition for Damages* (Rec. Doc. 1-1), ¶ 12.

[16]The active ingredient in Heartgard.

[17]See *Expert Report of Clarke Atkins, DVM* (Rec. Doc. 21-1), p. 10.

treatment with Heartgard until plaintiff's dogs, beginning with Red Terror, showed clinical signs of and tested positive for heartworms. Thus, the court finds genuine issues of material fact exist regarding the efficacy of the medication in preventing the escalation of heartworm disease, even assuming the dogs had heartworms before beginning Heartgard. There is a genuine issue whether the fact that none of the dogs had a heartworm test prior to initiation of Heartgard is dispositive of this issue.

*Redhibition*

Plaintiff also brings claims against Merial under redhibition, which is not eliminated by the LPLA as a means of recovery against a manufacturer. Instead, the LPLA is exclusive only for the recovery against the manufacturer for "damage" as defined by La.R.S. 9:2800.53(5) which provides in pertinent part:

> "Damage" means all damage caused by a product...for which Civil Code Articles 2315, 2315.1 and 2315.2 allow recovery. "Damage" includes...economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled "Redhibition," does not allow recovery for such damage or economic loss. Attorneys' fees are not recoverable under this Chapter.

The Louisiana Third Circuit Court of Appeal in <u>Safeco Ins. Co. v Chrysler Corp</u>, 2001-1641, 834 So.2d 1026, 1045-46 (La. App.3rd Cir. 7/31/2002) illustrated the differing remedies:

> The remedies for a claim under the LPLA and one in redhibition are different in a number of ways. The LPLA is the exclusive remedy against a manufacturer. See La.R.S. 9:2800.52. The LPLA does not allow for the recovery of attorney's fees pursuant to La.R.S. 9:2800.53(5), while

13

attorney's fees are recoverable from the manufacturer in a redhibition claim pursuant to Article 2545. However, in *Monk v. Scott Truck & Tractor*, 619 So.2d 890, 893 (La.App. 3 Cir.1993) we held:

The LPLA was never intended to eliminate redhibition as a means of recovery against a manufacturer. We hold that the Act is exclusive only for the recovery against the manufacturer for "damage" as defined by La.R.S. 9:2800.53(5).

. . .

The thinking of scholars who have written on this subject is that "redhibition survives only for economic loss. To the extent that the damage is compensable in redhibition, it is not damage under the Act. Hence, the Act's exclusivity provision does not prevent recovery for economic loss in redhibition." Galligan, The Louisiana Products Liability Act: Making Sense of it All, 49 La.L.Rev. 629, 645 (1989). The right to sue in redhibition for economic loss still exists. Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565, 580-581 (1989). This court agrees with these observations.[18]

Merial argues the plaintiff cannot prove that Heartgard was so useless that it was not fit for its intended use, i.e. that the plaintiff cannot establish a redhibitory defect exists under La. Civ. Code Art. 2520. However, La.Civ.Code Art. 2545 states:

A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.

A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing.

The court finds genuine issues of material fact exist as to whether Merial declared

---

[18] See also Draten v. Winn Dixie of La. Inc., 652 So.2d 675 (La. App. 1st Cir. 1995).

14

Heartgard had a quality it did not have, i.e. that it was 100 percent effective in the prevention of heartworm disease. If the plaintiff prevails on this claim, he can recover damages in the form of economic losses not covered under the LPLA and attorney's fees.

Merial argues that even if the plaintiff has a claim in redhibition it is prescribed. As the party asserting prescription, Merial has the burden of proof unless the claim is prescribed on its face. Titus v. IHOP Restaurant, Inc., 25 So.3d 761, 764 (La. 2009)(citations omitted). La. Civ. Code art. 2534 (B) provides:

> The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.

Under La. Civ. Code Art.2545, a seller is "deemed to know" of the defect when he is the manufacturer. Therefore, prescription would commence when the plaintiff discovered the defect. The court finds from the evidence of record that date was, at the very earliest, when Red Terror was diagnosed, but more likely when the other dogs tested positive. Those dates were May 20, 2009 and June 1, 2009 respectively.[19] Suit was filed in state court on February 23, 2010, and therefore, the case is not prescribed on its face.[20] Merial has provided no evidence that the date prescription began to run should have been earlier than May of 2009.

For the above reasons, summary judgment as to plaintiff's claims arising out of

---

[19] Exhibit D to *Merial LLC's Motion for Summary Judgment* (Rec. Doc. 21-4) pp. 5, 12 and 17.

[20] *Petition for Damages* (Rec. Doc. 1-1).

15

the death or illness of the dogs Cujo, Red Terror, and Pedals, whether under the LPLA or in redhibition, will be denied.

*Exemplary damages*

The defendant accurately points out the absence of any evidence that would entitle the plaintiff to punitive or exemplary damages. Neither theory of law under which the plaintiff is proceeding allow for the recovery of such damages. Plaintiff has offered no argument to the contrary. Therefore, this claim will be dismissed with prejudice.

*Conclusion*

Given the foregoing, and for the reasons set forth at oral argument,

**IT IS ORDERED** that Defendant Merial LLC's Motion to Strike Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [26], Plaintiff's Statement of Undisputed Material Facts [26-1], and Accompanying Exhibits [26-2 through 26-5] (Rec. Doc. 27) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Merial LLC's Motion for Summary Judgment. (Rec. Doc. 21) is **GRANTED IN PART and DENIED IN PART AS FOLLOWS**:

1) Plaintiff's claims arising out of the deaths of Red Rose and Chica XXIII are **DISMISSED WITH PREJUDICE;**

2) Plaintiff's claims based in negligence are **DISMISSED WITH PREJUDICE**;

3) Plaintiff's claims for exemplary damages are **DISMISSED WITH PREJUDICE;**

16

4) The remaining requests for relief are **DENIED**.

Lafayette, Louisiana, this 2nd day of February, 2011.

[signature]

Patrick J. Hanna
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)

17